**Alexander TCHEREPNIN et al., Plaintiffs,**

v.

**Robert FRANZ et al., Defendants.**

**Samuel BERKE, Receiver of City Savings Association, Cross-Plaintiff, Appellee,**

v.

**FIRST NATIONAL BANK AND TRUST COMPANY IN ALTON, Executor of the Estate of Joseph E. Knight, Cross-Defendant, Appellant.**

No. 77–1582.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1977.

Decided Jan. 23, 1978.

Rehearing and Rehearing En Banc Denied Feb. 24, 1978.

J. F. Schlafly, Jr., Alton, Ill., Raymond F. McNally, Jr., St. Louis, Mo., Edward S. Macie, Chicago, Ill., for cross-defendant, appellant.

Don H. Reuben, Chicago, Ill., for cross-plaintiff, appellee.

Before SWYGERT, CUMMINGS and BAUER, Circuit Judges.

BAUER, Circuit Judge.

This appeal represents the latest stage in the complex and protracted litigation spawned by the 1964 collapse of the City Savings Association, a Chicago-based savings and loan institution. Styled by the district court as a "chronicle of political intrigue and corruption perhaps unmatched in Illinois history," the failure of city Savings was in no small measure the handiwork of its president and director, C. Oran Mensik, who milked the association of millions of dollars through inflated mortgage loans and other fraudulent schemes. The central figure in this case, however, is Joseph Knight, Director of the Illinois Department of Financial Institutions from 1962 to 1968. More specifically, in this appeal, the Estate of Knight challenges the district court's finding that Knight was liable to the depositors of City Savings for his official conduct in connection with the association's demise. Before turning to a consideration of the appellant's arguments, however, we must first review the factual and statutory background of the proceedings below.

## I. Background

Because the history of this affair is fully set forth in the lower court's opinion, *Tcherepnin v. Franz*, D.C., 393 F.Supp. 1197 (1975), we need only briefly recount the central events in both the collapse of City Savings and the litigation that it engendered.

After encountering a serious capital impairment which prompted the State of Illinois to close its doors, the City Savings Association was reopened to the public on December 19, 1957. The association remained under judicial supervision until 1959 when, under the direction of its president and director, C. Oran Mensik, it embarked upon an aggressive promotional campaign to attract new depositors. From 1959 to 1964, it is now clear, the affairs of City Savings were not conducted in accordance with the provisions of the Illinois Savings and Loan Act. Most importantly—and these facts are not in dispute—City Savings made loans of more than $21,000,000 to entities controlled by Mensik or his nominees, loans that were "secured" by fraudulently overvalued property in the so-called "Apple Orchard" and "Howie-in-the-Hills" development projects.[1] These inflated mortgage loans, together with several other illegal acts of mismanagement,[2] left City Savings in a precarious financial condition with a capital impairment of more than $14,000,000.

Although the Department of Financial Institutions began examining the affairs of City Savings in January 1964, it was not until June of that year, when an independent audit conducted by Peat, Marwick, Mitchell & Co. revealed the full extent of City Savings' capital impairment, that Joseph Knight, Director of the Department of Financial Institutions, closed the association. Following the closing, in a meeting

---

1. When City Savings was closed on June 30, 1964, the outstanding net unpaid balance of the Apple Orchard loans was $14,827,415.20 and the outstanding net unpaid balance of the Howie-in-the-Hills loans was $5,675,047.14. *Tcherepnin v. Franz*, 316 F.Supp. 714, 718 (N.D.Ill.

1970). A subsequent appraisal indicated that the true value of the subdivision properties was $6,391,751.31.

2. See discussion *infra* at pp. 192–193.

held on July 28, 1964, the depositors of City Savings approved a plan of voluntary liquidation which placed the assets of the association in the hands of three voluntary liquidators, one nominated by Mensik and the other two by the State of Illinois.

The beginning of the lengthy litigation that followed the association's collapse came on July 29, 1964, when Alexander Tcherepnin and other holders of withdrawable capital shares of City Savings filed a complaint alleging that various state officials, the voluntary liquidators and others had violated the Securities Exchange Act of 1934.[3] When the plaintiffs subsequently moved for the appointment of a receiver, Judge Campbell, finding the state-supervised plan of voluntary liquidation to be "tainted with fraud from its inception," entered an order terminating the liquidation and appointing two receivers for the association.

The receivers proceeded to file their First Cross-Complaint on January 15, 1969, which, as amended, charged named state officials, including Joseph Knight, with breaching their statutory duties to City Savings, thereby rendering themselves, the State of Illinois and their surety liable for damages to the depositors. In the course of the subsequent litigation, the State and the receivers entered into settlement negotiations which culminated in the legislative appropriation of $12,467,500 for the reimbursement of the City Savings depositors. The receivers then filed a motion for summary judgment against the remaining cross-defendants on November 5, 1973. On April 14, 1975, the district court granted summary judgment on Counts I and II of the receivers' complaint against the Knight Estate, finding (1) that Joseph Knight had maliciously breached a statutory duty to supervise the affairs of City Savings; and (2) that Knight had either fraudulently participated in foisting the illegal plan of voluntary liquidation upon the City Savings depositors, or, alternatively, negligently

breached certain ministerial duties in connection with the adoption of that plan. It is from this judgment that the Estate now appeals.

## II. The Statutory Framework

Counts I and II of the receivers' complaint were premised on certain statutory duties imposed on the Director of the Department of Financial Institutions by the Illinois Savings and Loan Act. Ill.Rev.Stat. ch. 32, §§ 701–944 (1963). In essence, the Act charges the Department of Financial Institutions and its Director with supervising the affairs of all savings and loan associations within the state to insure that those businesses are operated "only by associations organized and conducted in accordance with the authority provided in this Act." Ill.Rev.Stat., ch. 32, § 702(b) (1963). To this end, Section 842 of the Act gives the Director access to the books of every savings and loan association within the state and requires him to conduct an examination of every association at least once a year. That same section also empowers the Director to require the officers and directors of any association that is not conducting its business in accordance with the Act to take corrective action. In addition, Section 843 empowers the Director to order, without prior notice, an audit of the books of any association, while Section 844 requires every association to file with the Department of Financial Institutions a statement of its financial condition at the close of the fiscal year. Finally, under Section 848, the Director is empowered to take custody of the books, records and assets of any association if, among other reasons, the association's capital is seriously impaired, or its business is being conducted in a "fraudulent, illegal, or unsafe manner."

In sum, then, the comprehensive powers granted to the Director of the Department of Financial Institutions are all designed to enable him to supervise the affairs of savings and loan associations within the State

---

**3.** On December 18, 1967, the Supreme Court held that the plaintiffs' withdrawable shares were "securities" within the meaning of the

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

of Illinois, and thus insure that every association is being conducted in accordance with the provisions of the Illinois Savings and Loan Act. With this in mind, we now turn to the appellant's arguments.

## III. Count I

The Knight Estate's initial argument on appeal invokes the doctrine of official immunity. Pointing to Knight's special status as a public official, and citing state and federal decisions endorsing the policy of official immunity, the Estate claims that Knight acted within the scope of his statutory authority in the years 1962–1964, and was thus immune from liability to the City Savings depositors.

It is true that a widely accepted principle of the common law holds that public officials are immune from liability for errors in judgment in the performance of their duties. See *Nagle v. Wakey*, 161 Ill. 387, 392–94, 43 N.E. 1079, 1081 (1896). But in Illinois, as in other jurisdictions, the immunity conferred on public officials is a qualified one, one that is displaced by an official's negligent conduct in the performance of ministerial duties or malicious and corrupt conduct in the performance of discretionary duties. *People ex rel. Munson v. Bartels*, 138 Ill. 322, 27 N.E. 1091 (1891). Clearly, then, Knight was not immune from liability if, as the lower court found, he maliciously breached a discretionary duty to supervise the affairs of City Savings. By the same token, Knight was not immune from liability if, as the court also found, he negligently breached certain ministerial duties in permitting the adoption of the plan of voluntary liquidation.

In this connection, however, the Estate makes two additional claims: first, that Knight's statutory duties were owed only to the public-at-large—that is, to the State of Illinois—and not to the depositors of City Savings; and second, that Count I

of the receivers' complaint did not allege Knight's conduct to be "malicious" or "corrupt." Neither argument is persuasive. While we agree that official misconduct can constitute an individual wrong only if a duty is owed to the party seeking redress, *People of the State of Illinois v. Maryland Casualty Co.*, 132 F.2d 850 (7th Cir. 1942), we find nothing in the Illinois Savings and Loan Act to suggest that Knight was charged with responsibilities only to the State of Illinois. On the contrary, the Act, by making repeated references to the "protection of the Association" in defining the duties of the Director,[4] indicates that the Association—and, more specifically, its depositors—have a vested right in the duties therein prescribed. See *Mills v. American Surety Co. of New York*, 26 Idaho 652, 145 P. 1097 (1914).

Nor can we agree that Count I of the receivers' complaint charged Knight with mere negligence in the performance of discretionary duties. The complaint, it is true, did not specifically characterize Knight's conduct as "malicious" or "corrupt." But this can be of no significance if the allegations necessarily entail malicious conduct, that is, the wanton and deliberate commission of a wrongful act.[5] See *State v. Dixon*, 80 Kan. 650, 103 P. 130 (1909). Such is the case here, for to allege, as the plaintiffs did, that Knight intentionally ignored or concealed examinations indicating that City Savings was not conducting its business in accordance with the Illinois Savings and Loan Act is necessarily to claim that Knight willfully and wantonly—in short, "maliciously"—breached his official duty to supervise the affairs of that institution. Thus, it is our conclusion that Joseph Knight, as Director of the Department of Financial Institutions for the State of Illinois, owed a statutory duty to the depositors of City Savings; that the intentional breach of that duty would constitute a malicious act; and that such malicious conduct

4. See, e. g., Ill.Rev.Stat. ch. 32, §§ 747, 848 (1963).

5. For definitions of "malice," see *Fromm v. Seyller*, 245 Ill.App. 392 (2d Dist.1927); *Kaplan v. Williams*, 245 Ill.App. 542 (1st Dist.1927); *Smith v. Moran*, 43 Ill.App.2d 373, 193 N.E.2d 466 (2d Dist.1967).

would override his qualified immunity as a public official.

■ The central question posed by Count I, then, is whether the district court was correct in finding that the evidence could support but one conclusion, namely, that Joseph Knight did in fact maliciously disregard his statutory duty to supervise the affairs of City Savings. On this point, the Estate argues that Knight's conduct prior to taking custody of City Savings was reasonable in light of the written reports that were available to him on City Savings' financial condition. In particular, the Estate emphasizes that the examinations of three independent auditors conducted in late 1963 and early 1964 all showed City Savings to be solvent. And, according to the Estate, it was not until June 1964, shortly before Knight took custody of City Savings, that he received a written report (the Peat, Marwick audit) indicating the capital impairment of more than $14,000,000.

This argument, however, proceeds on the assumption that the auditors' reports of solvency, all of which accepted as true the grossly inflated book values of property owned by City Savings, somehow neutralized the mounting evidence of massive irregularities, which, according to the undisputed testimony of state officials including Knight himself, came to the Director from other sources. Perhaps most important in this regard were the reports of Justin Hulman, an advisor to Knight, who in late 1963 and early 1964 investigated several financially troubled savings and loan institutions. According to his own testimony, Knight asked Hulman to examine the records of City Savings on file with the Department of Financial Institutions after learning of its financial straits in late 1963. In the course of his investigation, Hulman uncovered evidence strongly suggesting that City Savings had made inflated mortgage loans on overvalued property in the Apple Orchard and Howie-in-the-Hills projects. He also discovered that City Savings had recorded as "income" commissions on refinanced loans that were in fact never collected; that City Savings had listed among its assets $779,000 in promotional expenses which, if accorded proper accounting treatment, would have left the association without sufficient funds to cover even a minor loss; that City Savings had incurred excessive expenses in maintaining its accounts; and that City Savings' contingent reserves were low. These findings, together with Hulman's conclusion that City Savings was "in trouble," all were reported to Knight in January 1964.

They did not stand alone, however, for there were other facts at hand in January 1964 that should have alerted Knight to the need for immediate action, and all the more so after Hulman's dire report. Knight admitted, for example, that he knew in 1963 that City Savings' contingent reserves were less than the statutory minimum of 7½ percent.[6] He also learned in 1963, again by his own admission, that most of City Savings' loans were made to corporations having the same group of individuals as officers and directors—entities that were controlled, as it turned out, by Mensik and his brother-in-law, both of whom were officers of City Savings.[7] In addition, Knight was well aware that City Savings had been closed by the State of Illinois in 1957, that it had been unable to secure insurance from the Federal Savings and Loan Insurance

---

**6.** As the district court noted, even though Knight knew in 1963 and 1964 that the contingent reserves of City Savings were less than the statutory minimum of 7½ percent, he permitted the association to declare a dividend in December 1963 in clear violation of Section 780(b)(1) of the Illinois Savings and Loan Act.

**7.** This, too, was in violation of the Illinois Savings and Loan Act, as the lower court noted. Section 801 prohibits loans by an association "to any corporation of which a majority of the stock is owned or controlled . . . by any one or more of the directors [or] officers . . . of such association."

In this connection it is also significant that the annual statements of City Savings filed with the Department of Financial Institutions and the association's books and records revealed that more than eighty percent of its mortgage loans were "secured" by property in the Apple Orchard and Howie-in-the-Hills developments alone in 1963.

Corporation, and that any losses it suffered would therefore fall directly on the depositors. Finally, Knight knew, too, that Mensik had been convicted of mail fraud in Maryland in November 1963.

And yet, despite all this—the inability to obtain insurance, the evidence of excessive loans on overvalued property, the reports of improper accounting methods and dangerously low reserves, the troubled history of both Mensik and City Savings—despite all this and more, Knight failed to take any corrective action until June 26, 1964.[8] This failure to act decisively in the face of mounting evidence of statutory violations and financial mismanagement can only be characterized as a willful breach of Knight's official duties as Director of the Department of Financial Institutions. Thus, on the basis of these facts, none of which are in dispute, we must agree with the district court that Knight maliciously breached his statutory duty to supervise the affairs of City Savings, and that his Estate is therefore liable to the depositors for all losses resulting therefrom.

## IV. Count II

The district court also held the Estate liable for Knight's role in the adoption of the so-called plan of voluntary liquidation in July 1964. Under this plan, Knight relinquished control of City Savings' assets to three voluntary liquidators—one nominated by Mensik and the other two by the State of Illinois—on September 11, 1964. The voluntary liquidation thus left City Savings with no judicial supervision from June 26, 1964 until September 7, 1968, when Judge Campbell terminated the liquidation and appointed federal receivers.

The lower court concluded that Knight could be found liable for permitting the adoption of the plan under either of two theories: (1) fraud or (2) the breach of ministerial duties. On the first theory, the Estate argues that Count II of the receiv-

ers' complaint did not allege Knight's conduct to be fraudulent and thus violated Rule 9(b) of the Federal Rules of Civil Procedure. We need not decide this question, however, for we find ample grounds to affirm summary judgment on Count II in what the lower court termed the "statutory violation theory."

At issue here are the duties imposed on the Director of the Department of Financial Institutions by Sections 921 and 922 of the Illinois Savings and Loan Act, Ill.Rev.Stat. ch. 32, §§ 921–922 (1963). Section 921 provides:

> If the Director, after taking custody of an association . . . finds that any one or more of the reasons for taking custody continues to exist through the period of his custody, then he shall appoint any qualified person, firm or corporation as receiver or co-receiver of such association or trust for the purpose of liquidation.

Section 922 provides:

> After so appointing a receiver, the Director [of the Department of Financial Institutions] shall direct the Attorney General to file a complaint in equity in the name of the Director in the circuit or superior court of the county in which such association or trust is located and against the association or trustees or liquidators, as the case may be, for the orderly liquidation and dissolution of the association or trust and for an injunction restraining the officers, directors, trustees, or liquidators, from continuing the operation of the association or trust.

If these duties can be properly characterized as "ministerial," and if Knight did in fact breach them in permitting the adoption of the voluntary liquidation plan, then the Estate is liable for any injuries to the depositors caused by Knight's negligent conduct.[9] *People ex rel. Munson v. Bartels*, 138 Ill. 322, 27 N.E. 1091 (1891); *Thiele v.*

---

8. The first action of any kind that Knight took came on April 30, 1964—four months after learning of the overvalued loans and other irregularities—when he requested the Peat, Marwick audit.

9. As discussed *supra* at p. 191, Knight's statutory duties were owed to the depositors of City Savings.

*Kennedy,* 18 Ill.App.3d 465, 309 N.E.2d 394 (3d Dist.1974).

It is clear to us that the duties prescribed by Sections 921 and 922 are indeed "ministerial" as the Illinois Supreme Court has defined that term:

> Official duty is ministerial when it is absolute, certain, and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode, and occasion of its performance *with such certainty that nothing remains for judgment or discretion.*

*People ex rel. Munson v. Bartels, supra,* 138 Ill. at 328, 27 N.E. at 1092. Section 921 states that *if* the Director finds that "any one or more of the reasons for taking custody continues to exist through the period of his custody," he *"shall* appoint any qualified person, firm or corporation as receiver." Similarly, Section 922 states that *after* appointing a receiver, the Director *"shall* direct the Attorney General" first to file a complaint in equity against the association to insure an orderly dissolution, and second to seek an injunction restraining the officers and directors of the association from continuing operations. Clearly, then, Sections 921 and 922 call for the execution of set tasks and define the "time, mode and occasion of [their] performance with such certainty that nothing remains for judgment or discretion." *People ex rel. Munson v. Bartels, supra* at 328, 27 N.E. at 1092.

It is equally apparent that Knight breached the ministerial obligations of Sections 921 and 922. By his *own* admission, none of the conditions that finally compelled him to take custody of City Savings on June 26, 1964 were cured when he relinquished control of the association on September 11, 1964. But in disregard of Sections 921 and 922, Knight failed to (1) appoint a receiver for City Savings, (2) direct the Attorney General to file a complaint against City Savings, or (3) direct the Attorney General to seek an injunction restraining the officers and directors of City Savings from continuing operations. This failure of a public official to perform acts required by statute constitutes an actionable breach of a ministerial duty. See *People ex rel. Pope County v. Shelter,* 318 Ill.App. 279, 47 N.E.2d 732 (4th Cir. 1943). Thus, we agree with the district court that the Estate is liable to the depositors of City Savings for all damages resulting from Knight's acquiescence in the adoption and implementation of the voluntary liquidation plan.

We have examined the Estate's other arguments and find them to be without merit. The judgment of the district court is therefore

AFFIRMED.