GOVERNMENT OF THE NORTHERN ) CIVIL ACTION NO. 84-329
MARIANA ISLANDS, )
)
 Plaintiff, )
)
 vs. ) MEMORANDUM OPINION
)
)
MICRONESIAN INSURANCE )
UNDERWRITERS, INC., et al., )
)
 Defendants. )
_____ )

## GENERAL HISTORY OF THE CASE

In order to better understand the posture of this case as presented to the court at trial, a recapitulation of some facts, germane motions, and procedural matters is in order. In most cases the file reflects more detailed reasons for the rulings on various motions and the resolution of certain matters related herein. Only those matters which are essential for the final adjudication of this matter are elaborated on and discussed in some detail.

The Commonwealth Bank of the Northern Marianas (Bank) was formed as a corporation and given a charter as a retail bank in 1982. It opened for business in the first part of February, 1983. At that time there were five directors of the Bank, Manuel Sablan, T.B. Cheung, Karl Reyes, Norman Chan and

Albert Camacho. The corporate records indicate other individuals such as Antonio Guerrero, Thomas Villagomez, and Stanley Torres became involved and acted as directors subsequent to the opening of the Bank.

In November of 1983, the Government of the Northern Mariana Islands (Government) deposited $600,000 in the Bank which was supposedly secured by a bond issued by Micronesian Insurance Underwriters (MIU).

By early 1984, depositors were not able to have their checks and deposits honored because of a cash shortage in the Bank. The situation deteriorated until the Bank was placed into receivership by Order of this Court. (See, In Re Receivership, Commonwealth Bank, CTC Civil Action 84-204). The Bank continues to be in receivership and the Receiver represents the corporation in this and other cases.

This action was initiated by the Government against MIU when the former failed to collect its $600,000 on deposit with the Bank.[1] MIU filed a cross-complaint against the Bank and the five original directors. The Bank, through the Receiver, then filed a cross-claim against the original five directors and all other individuals or entities who appear in the Bank's corporate records as incorporators or directors. Additionally, the Receiver filed an action against the Government

---

[1] The Government also included as defendants numerous individuals who were purportedly directors of MIU. These individuals were subsequently dismissed by the Government as defendants.

781

essentially on the theory that the Government had negligently allowed the Bank to operate to the detriment of its creditors and depositors.

### SUMMARY OF PROCEDURAL HISTORY

After some discovery had been completed, MIU filed a motion for summary judgment and on October 18, 1985 this court granted a summary judgment against the Government, effectively removing MIU from any further part in the trial proceedings. The Government has appealed this ruling and the matter remains on appeal.

Various other summary judgment and dismissal motions were filed by and against the individuals who appear in the corporate records at one time or another as directors. There were three theories advanced for liability of the directors: 1. Common law negligence; 2. Fraud, and; (3) Statutory liability pursuant to Section 2.7 of Title 37, Trust Territory Regulations.[2]

---

2/
Section 2.7 reads:

"2.7 Capital Necessary to Engage in Business; Liability of Directors. No corporation for profit shall upon the incorporation thereof engage in business in the Territory until three-fourths of its authorized capital stock has been subscribed for nor until ten percent of its authorized capital stock has been paid in by the acquisition of cash or by the acquisition of property of a value equal to ten percent of the authorized capital stock ... In case of any violation of this section by any corporation, the incorporators and the directors thereof at the time the corporation commences to engage in business shall in their individual and private capacities be jointly and severally liable to the corporation and the stockholders and creditors thereof in the event of its bankruptcy or insolvency or in the event of its dissolution for any loss suffered by the corporation or its stockholders or creditors."

The sum and substance of the court's rulings on these matters were:

1. Directors Sablan, Cheung, Chan, Reyes and Camacho were directors at the time the Bank commenced business in early February, 1983.

2. The Bank's capitalization did not comply with the minimum requirements of Section 2.7.

3. The five directors are liable for losses to the Bank pursuant to Section 2.7.

4. This liability runs to the Receiver who represents the Bank which in turn owes the money to the creditors and depositors.

5. The Government did not plead an action against the five directors, but even if such an action was pled, the Receiver was the proper party to proceed and recover on the Section 2.7 claim for ultimate distribution to all creditors of the Bank, including the Government.

6. The Government neither pled a common law liability claim against the directors nor could it maintain such a suit, since the Corporation (Receiver) was the proper party to proceed on this claim.

7. The other individuals who appear in the corporate records as directors are not subject to Section 2.7 liability as they were not directors at the time the Bank commenced business.

8. The Receiver did have a cause of action for fraud and common law directors liability against all individuals who appear in the corporate records as directors.

9. The matter of Section 2.7 damages was left for trial as well as the claims of the Receiver for fraud and directors liability under the common law theory. In addition, the matter of whether the Government was liable to the Bank, i.e. Receiver, for negligence was deferred to trial.

### STATUS OF THE PARTIES AT THE TIME OF TRIAL
(In order of pleadings - excluding MIU and its directors)

1. GOVERNMENT - Its position is strictly as a defendant to the Receiver's Fifth Cause of Action on the Receiver's First Amended Cross-Claim.

2. RECEIVER (BANK) - He bears the burden of:

(a) Proof of Section 2.7 damages against Manuel Sablan, T.B. Cheung, Norman Chan, Karl Reyes and Albert Camacho.[3]

(b) Proof of fraud and common law directors liability against directors and purported directors: Manuel Sablan, T.B. Cheung, Norman Chan, Karl Reyes, Albert Camacho, James Cheung, Henry Cheung, Wu Ting Shih, Greenmount Development Marianas Corporation, Antonio S. Guerrero, Manuel S. Villagomez, Stanley T. Torres, Prudencio Manglona,

---

[3] As will be seen, this burden was further narrowed by the settlement of claims against Chan and Reyes.

784

Vicente M. Manglona, Thomas P. Villagomez, and Vicente A. Manglona.[4]

(c) Proof of claim against the Government for negligence - Fifth Cause of Action, First Amended Cross-Claim.

3. MANUEL SABLAN - Defaulted; subject to Section 2.7 damages and any other proven claim based on fraud and directors liability.

4. KARL REYES - Settled prior to trial. Judgment on stipulation entered.

5. ALBERT CAMACHO - Liable for Section 2.7 damages according to proof. Subject to possible liability on Receiver's claims for fraud and directors liability.

6. NORMAN CHAN - Settled prior to trial. Judgment on stipulation entered.

7. T.B. CHEUNG, a/k/a CHEUNG TING BONG - Defaulted; same as Manuel Sablan.

8. JAMES CHEUNG, a/k/a CHEUNG TING WAH - Default; subject to damages - fraud and directors liability.

9. HENRY CHEUNG, a/k/a CHEUNG TING KAM - Default; same as James Cheung.

10. WU TING SHIH - No appearance and no default entered.

---

[4] Of these 16 defendants, two are dismissed as defendants (M. Villagomez and Prudencio Manglona) and seven have settled (Chan, Reyes, Guerrero, Torres, V.M. Manglona, T. Villagomez and V.A. Manglona). All of the remaining have defaulted or not appeared except for Albert Camacho.

11. GREENMOUNT DEV. MARIANAS CORP. - Default - same as James Cheung.

12. ANTONIO S. GUERRERO - Settled prior to trial.

13. MANUEL S. VILLAGOMEZ - Dismissed by the Court.

14. STANLEY T. TORRES - Settled prior to trial.

15. PRUDENCIO MANGLONA - Dismissed as party.

16. VICENTE M. MANGLONA - Settled prior to trial.

17. THOMAS P. VILLAGOMEZ - Settled prior to trial.

18. VICENTE A. MANGLONA - Settled prior to trial.

## SECTION 2.7 DAMAGES

The testimony of the accountant for the Receiver and the exhibits admitted into evidence show that at the very inception, the Bank was not adequately managed or capitalized. In the words of the accountant, the Bank had a basic policy of borrowing short and lending long. The most the Bank enjoyed as far as paid in capital was $344,944 in December, 1983 but which was reduced to $316,201 by the time the Bank closed.

As of the date of the closing of the Bank, the losses totaled $425,559. Subsequently, the court approved creditors claims totalled $62,980 which means the total amount of money to pay off all the depositors, creditors, and stockholders at the date the Bank closed, was $488,540 (Receiver's Exhibit 19). Due to a small discrepancy in reconciling the Bank's records, the Accountant concluded that the loss from inception thru April 27, 1984, the effective closing date of the Bank, would have to be adjusted to $489,625 (Receiver's

Exhibit 15). Of this sum, $316,201 would be the amount paid in by purchasers of stock.

Additionally, the Accountant has calculated the amount of interest due depositors. The original loss figure ($489,625) includes interest to May 1, 1984 due depositors according to the agreements the depositors had with the Bank. Thereafter, there is added interest at the rate of 9% per annum from May 1, 1984 to the date of first distribution to creditors by the Receiver on December 25, 1985. Since the distribution reduced the amount of principal due, a new computation, at 9% per annum, was made on the accounts from December 25, 1985 to August 4, 1986, the date the trial started. The total amount of interest due on checking, saving and Time Certificate deposits is $342,133.07 (Receiver's Exhibit 16).

The Receiver claims the total of the losses ($489,625) plus the interest ($342,133.07) or $831,758 as the Section 2.7 liability.

Section 2.7 is penal in nature and accordingly will be strictly construed. Chase v Curtis, 113 U.S. 452, 5 S.Ct. 554, 28 L.Ed. 1038. To the court's knowledge, this is the first time this particular regulation has been used and applied. Although the wording of Section 2.7 seems simple enough, there are significant and perplexing problems raised when trying to assess the proper amount due from the directors.

Defendant Albert Camacho has raised three questions that need to be responded to.

First, it is asserted that since the accountant testified that at the date the Bank opened its doors for business it had a "cash flow problem" which means that its ability to disburse cash was less than its available cash, it was insolvent and at that time the Section 2.7 cause of action accrued. Thus, it is argued, Camacho's liability is to be calculated at that time which would reveal no losses. This is not a reasonable interpretation of Section 2.7. The liability imposed by the regulation is for the losses incurred by the Bank following the commencement of business. The liability is based on the fact that the directors and incorporators failed to adequately capitalize the corporation. To accept Camacho's theory would thoroughly emasculate Section 2.7 because any corporation at the commencement of business presumably starts out with a zero balance so to speak. Section 2.7 provides for the losses accruing - not at the opening of the business - but subsequent thereto as a result of the directors failing to get it started with a minimum amount of capital. Although the Bank had become insolvent prior to April 27, 1984, Camacho cannot pick an earlier date to avoid the damages suffered by the creditors of the Bank. The losses to the creditors are determined at the time insolvency reaches a point when the corporation files for bankruptcy or a receiver assumes control of the corporation.

Next, Camacho argues that "losses" do not include the pre-judgment interest as calculated by the accountant and to do so would provide the depositors a windfall. Camacho stands on firmer ground here.

788

Section 2.7 does not define "losses". However, in construing the "losses" of the corporation, it is clear that the receivership would only be a conduit for passing on, the interest collected from Camacho to the depositors. Thus, the matter of interest on depositors money must be analyzed in the context of the receivership and, by analogy, what transpires in bankruptcy matters.

Prior to the date of receivership, the corporation incurred liability for the payment of interest on depositor accounts. As of the date of receivership, the principal amount of the deposit plus accrued interest was the total debt owed by the Bank. Thus on that date interest is properly calculated to be encompassed within the term of "losses" of the Bank.

However, upon the entry of the Bank into receivership, a transformation occurred. Control of the Bank was effectively and completely transferred from the directors, officers and shareholders of the corporation to the Receiver. From the inception of the receivership to the present, the management of the Bank has been vested in the Receiver and will remain there until the receivership is terminated and control of the Bank is relinquished back to the Directors and shareholders or upon the complete dissolution of the Bank. During the period of stewardship by the Receiver, he is entitled to and does receive protection from the court against interference with his custody and possession of assets as well as his management. Re Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689. The Receiver stands

789

in the position of a representative and a protector of the interests of the depositors. <u>Camerer v California Sav. & Com. Bank</u>, 48 P.2d, 100 ALR 667.

■ Insofar as liabilities incurred during the receivership are concern, they are liabilities of the receivership and not the corporation <u>per</u> <u>se</u>. In the case of the receivership of the Commonwealth Bank, the Receiver assumed control of an operating business to the extent that it assumed liabilities for interest on the deposits as well as collecting interest and principal on outstanding loans of the Bank. The deposits actually provided the funding for the loans made by the Bank. There has been no evidence presented as to the projected outcome of what the ultimate balance will be when all loans are collected with interest and the depositors paid with or without interest. Conceivably, it could be either a surplus or a break even affair. In any event, the Receiver has failed to show that at this point it is a loss of the corporation.

Once the court has authorized the Receiver to carry on the function of collecting on the outstanding loans any losses are those of the Receiver. <u>Dalliba v Winschell</u>, 82 P. 107.

It is assumed (as the evidence has not shown differently) that all depositors stand on equal footing, and that they are entitled to interest during the period of receivership and until they are paid in full or the assets of the receivership are fully distributed. <u>American Iron & Steel Mfg. Co. v Seabound Airlines R. Co.</u>, 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed.

790

949; <u>Ohio Sav. Bank & Trust Co. v Willys Corp.</u>, (CA 2) 8 F.2d 463, 44 ALR 1162.

Thus, the Receiver's claim that Section 2.7 losses include post-receivership interest must fail. It has not shown to be a "loss". Even if it is, it is not a loss of the corporation but more akin to an operating expense of the Receivership.

Should the above not be the case, it is not difficult to see the inequities and practical problems which would arise. Assume a director is required to pay the interest claimed to date. Is the interest loss to depositors the 9% the Receiver claims, the agreed upon amount in the depositors passbook, or a figure based on current rates? If the Receiver continues for another five years, can the Receiver file new claims for accrued interest against the Section 2.7 directors? If the Receiver collects principal and interest on the outstanding loans which eventually exceeds the principal and interest due to depositors, is there an obligation to reimburse the paying directors?

Just as in the case of bankruptcy, the inception of the receivership is the benchmark of the debtors liability. Section 2.7 cannot be interpreted to impose liability upon the directors for what occurs during the receivership. Section 2.7 imposes liability on the directors "for any loss suffered by the corporation ...." This must be construed to include only those losses accrued to the date of actual fact· of insolvency which is the date the Receiver took over the assets and liabilities of the Bank.

791

Lastly, Camacho points out that the $489,625 loss includes $316,201 due shareholders including his co-directors caught in the Section 2.7 liability net. It is argued that justice should not require him to pay that money to the Receiver at the same time the latter charges them with fraud as well as Section 2.7 liability.

A scenario helps to demonstrate the situation. Assume Camacho pays $489,000 to the Receiver or the Receiver executes on property of Camacho worth this amount. One of the directors/shareholders subject to Section 2.7 liability is T.B. Cheung who resides in Hong Kong and has defaulted. The Receiver, having obtained his maximum relief under Section 2.7, need not look to any other Section 2.7 defendants. He uses the cash to pay off the depositors and then sends checks to the shareholders, including T.B. Cheung, for their stock. Camacho may file suit against his co-directors for contribution since they are jointly and severally liable but the practical problems of collection are evident. Would not Camacho's best course of action be to file against Cheung before the Receiver pays, attach the amount in the Receiver's hands and collect on the fund based on his contribution suit?

It is manifest that to require one Section 2.7 defendant to pay another Section 2.7 defendant for his stock, does not comport with common sense. Section 2.7 must be interpreted to exclude such a result. It is held that Camacho is liable to those shareholders who are not co-defendants under

792

Section 2.7. This is what the section is designed for. There is a big difference between a shareholder who simply invests in the corporation and does not become a director within the terms of Section 2.7 and a shareholder such as T.B. Cheung who allows the corporation to commence business knowing it is undercapitalized.

In order to ascertain the portion of the $316,201 which does not include amounts paid in by Camacho's co-defendants, the court has reviewed the stock ledger and a separate affidavit of the accountant for the Receiver. There are two Section 2.7 co-defendants, T.B. Cheung and Norman Chan, who were shareholders. Cheung invested $191,500 and Chan $12,000 for a total of $203,500. Excluding this amount, Camacho's Section 2.7 liability is established at $286,125 ($489,625 less $203,500).

The liability of Manuel Sablan and T.B. Cheung is computed the same and therefore all three defendants, Sablan, Cheung and Camacho are jointly and severally liable to the Receiver in the amount of $286,125.

### LIABILITY FOR FRAUD AND/OR COMMON LAW DIRECTORS LIABILITY

The second cause of action of the Receiver's First Amended Cross-Claim alleges, inter alia, that the various directors intentionally or negligently diverted $600,000 of the Government's money for non-corprate purposes. The third cause of action alleges fraud by inducing MIU to guarantee the Government's deposit. The fourth cause of action essentially

repeats the allegations of the other two counts. Although, some defendants have defaulted, there is no evidence that any of the $600,000 was diverted for non-corporate uses. The Receiver has testified there is no evidence of defalcation. The accountant lays the blame on the demise of the Bank and its bad management and policies for loans. Consequently, even though some defendants have defaulted, the court has no basis upon which to enter a judgment on these grounds.

There is evidence to support the general fraud allegations as well as common law directors liability against Manuel Sablan. He was instrumental in obtaining or arranging the MIU bond; he either authorized or directed misrepresentations at various times as to the financial status of the corporation, the paid-in capital and the prospective investors in the corporation. This had the affect of misleading the public, the depositors, MIU, and the Government. There is no doubt he was the central figure in the formation and demise of the Bank and is liable to the Receiver for the losses incurred. Based on the above, the court fixes this at the full $489,625 because his acts caused losses to the depositors as well as the shareholders who did not act in concert with him.

As to the remaining defendants before the court, including T.B. Cheung and Albert Camacho, the court finds no basis upon which to impose any common law directors liability. Though they were inattentive to their duties as directors and should

have known or should have learned of the fiscal status of the Bank and its poor management, the court is not convinced that this failure to act translates into liability. The Receiver has failed to show this neglect was the proximate cause of the losses to the corporation. Admittedly as to Cheung and Camacho, it is a close call since they were two of the original five directors. But Cheung was more or less an absentee director while Camacho was not that instrumental in corporate policy or management. Something more than neglect needs to be shown and the Receiver has failed to meet that burden. Neither the testimony nor the exhibits admitted implicates this group of individuals to the extent that they must stand liable for the losses to the depositors and creditors.

## RECEIVER VERSUS THE GOVERNMENT

A. HAS THE RECEIVER PLED A CAUSE OF ACTION BASED ON THE FAILURE TO ENFORCE THE 1983 REGULATIONS AND THE 1984 CODE PROVISIONS AS WELL AS SECTION 2.7 LIABILITY?

The Government resists the Receiver's claim under his Fifth Cause of Action, First Amended Cross-Claim on two basic grounds. First, at trial, it was argued that the Receiver had not properly pled a general duty (as opposed to a Section 2.7 duty) to see that the Commonwealth Bank was properly organized and in compliance with government regulations and laws. Second, the Government asserts its acts are immune from suit, citing 7 CMC § 2204(a).

795

Admittedly, the Fifth Cause of Action, specifically paragraphs 24, 25, and 26, stresses the Section 2.7 capitalization enforcement. These paragraphs also refer to the enforcement of the Commonwealth Code and Corporation Regulations. These references are determinative in the Government's mind as limiting the scope of any potential liability of the Government. The reasons for this requires some history of the pertinent regulations and statutes relating to retail banks.

For the purposes of resolving this issue, the court starts in 1982 when the Commonwealth Bank filed its corporate articles and received a corporate charter from the Registrar of Corporations. At this time the only regulation or statute which pertained to the Bank was Section 2.7 of the Trust Territory Regulations. By the end of 1982 or the early part of 1983 the Government realized that Banks such as the Commonwealth Bank could open their doors without any meaningful supervision and control. To correct this omission, work commenced on new regulations but it was not until June 6, 1983 that the regulations become effective. These regulations are in evidence as Receiver's Exhibit 1.[5]

Normally, a_ retail banks, including the Commonwealth Bank, had to obtain a renewal to their business license by

---

[5] The Regulations were promulgated by the Director of Commerce and Labor pursuant to authority found in Public Law 1-8, Chapter 9 and Public Law 3-11, Section 503.

November 1, 1983 but due to having no forms, the Director of Banking extended the time to file to November 30, 1983. Receiver's Exhibit 5 is the Bank's application which was filed on November 30, 1983.

On February 6, 1984 the Commonwealth Banking Act became effective. This Act is codified at 4 CMC § 6201 et seq. This effectively abolished the regulations evidenced by Receiver's Exhibit 1.

From the above, it is evident that paragraph 24 of the Receiver's Fifth Cause of Action had to include the June 6, 1983 regulations. They were the only regulations pertaining to retail banks from June, 1983 to February, 1984. The limited reading the Government wishes to ascribe to the pleading is neither reasonable nor was there any surprise or prejudice to the Government for not specifying the June regulations. In simple terms, paragraph 24 of the Fifth Cause of Action alleges that the Director of Banking is responsible for the enforcement of the Code and regulations "pertaining to the regulation and operation of the banks." The Government knew from almost the very inception of this litigation that the June, 1983 regulations were instrumental in resolving the various claims.

MIU's summary judgment motion and the court's ruling thereon considered the application and effect of the $500,000 capitalization requirement found in Section 6(b)i and ii of Receiver's Exhibit 1. Indeed, the regulations entered significantly in the determination of the Summary Judgment.

797

(See, Summary Judgment, pp. 5-7, dated 10-18-85)

Early discovery by the various parties to this litigation, including the Government, dealt with the financial status and condition of the Bank from its inception to date of the receivership (See, Summary Judgment, p. 4, dated 10-18-85).

In 1986 discovery by the Receiver focused on the 1983 regulations and a dispute arose as to the answers to be provided the Receiver by the Government. The objection of the Government was raised because of claimed protection in the deliberation and decision making processes of the Division of Banking and not to the relevance or application of the 1983 regulations. (See, Government Memorandum filed 5-30-86).

Pending at that time was the Government's motion for partial summary judgment directed at the Receiver's Fifth Cause of Action.

A review of that motion is revealing. The Government places the procedural posture of the Receiver's claim thereby:

> "The Bank has alleged, among other things, that CNMI is liable to it in damages for negligently or willfully failing to supervise, regulate and enforce provisions of the Commonwealth Banking Code.
>
> In essence the Bank is claiming that CNMI failed to require The Bank to comply with CNMI laws. The Bank claims The Bank violated those banking laws, and because of the violations, become insolvent. The Bank further claims that it was CNMI's negligent enforcement of the law that allowed the Bank to violate, and thus CNMI is liable in money damages to the Bank."
>
> (See page 2, Procedural History" Memorandum filed 5-1-86)

The motion proceeded to cite cases and argue against <u>any</u> liability of the Government for its asserted failure to enforce regulations and statute. Conspicuously Section 2.7 of the Trust Territory Regulations is not even mentioned.

The Receiver opposed the motion and construed the Government's motion as follows:

> "The Receiver ... opposes ... CNMI's Motion ... on the grounds that as a matter of law liability should be imposed on the CNMI for the failure of the Director of Commerce and Labor (The Banking Director) to exercise his duty to regulate the Bank under the provisions of the Retail Banking Rules and Regulations, and under the provisions of the CNMI Banking Act which required him to act to protect "the security of deposits and depositors."

> (See p. 1, Opposition to Summary Judgment filed 6-3-86)

Both the written and oral arguments centered upon the rules and regulations of June, 1983 and the Banking Code effective February 6, 1984. Section 2.7 almost became lost in the shuffle in so far as the Receiver and the Government was concerned because it was obvious the main thrust of the Receiver's action was directed to the implementation and enforcement of the June, 1983 regulations and the February, 1984 code provisions.

The Receiver's opposition to the motion directed attention to some of the same exhibits admitted into evidence at trial which go directly to the enforcement (or lack of same) of the 1983 regulations and 1984 Code provisions. (See, p. 3, Receiver's Opposition)

The order denying the Government's motion entered June 9, 1986 perceived the matter as presented by the Government and Receiver:

> "Count 5 of the cross-claim alleges that the Government, through the Registrar of Corporations and Director of Banking, is responsible for enforcement of <u>various statutes and regulatory provisions in so far as banks are concerned</u>.
>
> . . .
>
> It is concluded that the Receiver should have the opportunity to show whether the Director of Banking breached his duties outlined <u>in the law and regulations</u>, the manner in which the <u>breach occurred</u>, and whether any such breach, confers a right of compensation to the depositors and creditors of the Bank." (See Order, pp 1 & 3, emphasis added.)

The trial of this matter proceeded on this basis. The record will reveal the Receiver, in his opening statement based his claim against the Government on its failure to regulate and the corresponding breach of duty. The Government responded by saying it would show due care was taken.

It was not until after the Director of Banking and his assistant, Mr. Fitial had testified and the regulations of June, 1983 were admitted into evidence that the Government, for the very first time, objected to the pleading of the Receiver and asserted that only Section 2.7 could be considered.

The court rejected the Government's motion to restrict the scope of the pleading then and it reaffirms its position now.

Of importance is the fact that the Government claims no prejudice or surprise as a result of the pleading; nor does the record in this case reveal <u>any</u> basis for claiming it.

It is concluded that not only are the allegations of the Receiver's Fifth Cause of Action sufficient to encompass the scope of his claim presented here and not just limited to Section 2.7, but also the Government has known and proceeded upon this basis from the early days of this litigation.

B. IS THERE A BASIS FOR A CLAIM AGAINST THE GOVERNMENT FOR FAILURE TO ENFORCE THE MINIMUM CAPITALIZATION REQUIREMENTS OF SECTION 2.7?

The Government points out that at the time the Commonwealth Bank filed its articles and obtained its charter, the only statute its officials were obligated to enforce was Public Law 3-11. Under this law, the Commonwealth Bank was entitled to its charter when it complied with the filing requirements and paid its license fee.

The Receiver, in essence, concedes this but argues that when the Bank submitted its application for renewal for its 1983 license (Receiver's Exhibit 3) the Government was put on notice that the Bank did not meet the capitalization requirements of Section 2.7. This conclusion is reached by comparing the Bank's articles and by-laws filed with the Registrar of Corporations (Receiver's Exhibit 14) and the application for renewal (Receiver's Exhibit 3) which shows $250,000 as the "size of the corporation." The only problem with this conclusion is that the Bank had not commenced

business by the time Exhibit 3 was filed with the business licensing branch.

What actually occurred is that there was such a paucity of government regulation of banks at the time the Commonwealth Bank commenced business there was no effective way to confirm compliance with Section 2.7. This, of course, does not connote negligence or lack of due care on behalf of the Government. It is only when there is a question of enforcing or not enforcing a statute or regulation in existence that the issue of liability is raised.

 Another hurdle presents itself to the Receiver's Section 2.7 claim.

The section imposes liability on the incorporators and directors for allowing a corporation to commence business without the minimum capital. There is no indication that the Government is to be held liable under the section nor is the section broad enough to require an affirmative duty to police it. Consequently, it is concluded that the Government is not liable for any failure to enforce Section 2.7.

C. HAS THE GOVERNMENT INCURRED LIABILITY FOR ITS PERFORMANCE IN ENFORCING THE JUNE, 1983 RETAIL BANK REGULATIONS?

The Receiver claims the Government failed to enforce these regulations and is liable to the Receiver as the representative of the creditors and depositors of the Bank.

The Government asserts that the regulations are discretionary and that the Government interpreted them in a

fashion which eliminates any potential liability. The basis for this assertion is essentially encompassed in the testimony of Mr. Fitial, the assistant to the Director of Banking.

Mr. Fitial testified that as early as December, 1982 discussions were held and drafts written for regulations to give the Director of Commerce and Labor some enforcement power over retail banks. In these discussions there were several time periods suggested to allow existing banks to either obtain federal deposit insurance on accounts or to come up with sufficient capital to safeguard depositors and the public.

Eighteen months was the period of time which stuck in Mr. Fitial's mind. Therefore when the regulations finally became effective on June 6, 1983 he construed them as allowing existing banks (including the Commonwealth Bank) to have eighteen months to either obtain deposit insurance or the capital and paid-in surplus required in Section 6(b) of the regulations.

The Government argues that such a construction is reasonable and that in the absence of a court ruling to the contrary, the interpretation of an administrative regulation by the agency charged with the duty of enforcing that regulation is controlling. Citing: 1 CMC § 9101(k); Udall v Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1968) reh. den. 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283; Power Reactor Co. v International Union of Electrical Workers, 367 U.S. 3, 81 S.Ct. 1529, 6 L.Ed.2d 924; Chevron USA v Natural Resources Defense, 104 S.Ct. 1778 (1984).

██ A review of 1 CMC § 9101(k), the cases cited and other authorities the court is referred to does not support the proposition advanced by the Government. What the well accepted and firmly established law is that: (1) great deference will be given to an agency's interpretation of an administration rule, Udall v Tallman, supra; Power Reactor v International Union of Elec. Workers, supra; but (b) a court need not accept the agency's interpretation if it is clearly erroneous, Chevron USA v Natural Resources Defense, supra, or the interpretation is inconsistent with the regulation. Bowles v Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217. .

The law in the Commonwealth is consistent with this general and universal rule. 1 CMC § 9112(f). What the Government wishes the court to accept is that no matter how erroneous and inconsistent the agency's interpretation is, the court and the affected parties must abide by that interpretation. That is not the law nor does it comport with common sense.

██ Turning to the regulations, a thorough analysis readily reveals that the "interpretation" of Mr. Fitial was neither reasonable nor consistent with the terms of the regulations. The court easily determines the "interpretation" was clearly erroneous.

The reader will note the quotes used for the term "interpretation." This is because the testimony indicates that there was actually no interpretation by Fitial of Receiver's Exhibit 1. What occurred is that Fitial had 18 months in his

mind from the prior discussions and just used that time to allow existing banks to prove that they met minimum capital requirements. His testimony does not reveal any review, discretion or meaningful understanding of the regulations. He admits he thought the Bank had 18 months to comply based on the prior discussions and he was "confused". It is evident that there was not even an effort of attempting to interpret the regulations because there has been shown no ambiguity which may require an agency interpretation. If a regulation or provision therein is certain, unambiguous and obligatory, an agency cannot just "interpret" it to reach another result.

Any governmental liability cannot be supported unless the acts or omissions of the agency were clearly erroneous or inconsistent with the regulations.

The plain and unambiguous terms of the regulations provide that:

1. Existing banks were allowed 18 months from June 6, 1983 to secure federal deposit insurance. Failure of a bank to obtain insurance subjects it to revocation proceeding. Section 6(a).

2. If a bank does not have federal deposit insurance in the 18 month period, it must have capital of $500,000 and paid-in surplus of $200,000. Section 6(b).

3. In order to comply with Section 6(b), existing banks are allow 120 days from June 6, 1983 to supply proof of the minimum capitalization requirements or to supply proof of FDIC or FSLIC insurance coverage. Section 6(c).

4. "Failure to supply proof of either the ... minimum capitalization requirements or FDIC or FSLIC status, within the one hundred and twenty (120) day period following (6-6-83), will subject the licensee to revocation proceedings under Section 16 herein." Section 6(c).

5. Revocation proceedings require the Director of Banking to have the licensee appear before him and make a finding that evidence exists to revoke his license when the Bank has "failed to supply the Director with proof of compliance with Section 6 within one hundred and twenty (120) days of (June 6, 1983)." Section 16(a)iii.

6. Once the Director makes the finding he shall either take steps to secure correction of non-compliance or revoke the banking license. Section 16(a).

The evidence is uncontradicted that the Director of Banking:

1. Did not receive proof of compliance from the Commonwealth Bank on October 5, 1983.

2. The Commonwealth Bank did not have federal deposit insurance or $500,000 capital or $200,000 paid-in surplus at any time.

3. The Director of Banking did not grant a hearing or investigate the failure of the Commonwealth Bank to comply with Section 6.

4. The Director of Banking made no finding of non-compliance.

5. The Director of Banking neither instituted corrective action nor revocation proceedings.

In sum, the Director of Banking did not implement, enforce or apply any provision of the regulations as long as they were in existence.[6]

Even if an "interpretation" of the regulations by the Director of Banking had occurred, the eighteen months grace period construction was both clearly erroneous and inconsistent with the plain terms of the regulations.

The next line of defense the Government relies upon is even if the above is true, 7 CMC § 2204(a) provides immunity.[7]

This section is essentially drafted from 28 USC § 2680 and consequently cases interpreting that section are helpful. Employment Consultants Inc. v O'Connor, CTC Civil Action 84-424.

---

[6] The Government points to a letter written by Fitial to the Bank on January 27, 1984, presumably as an indication of enforcement. The letter (Receiver Exhibit 8) speaks for itself and deserves no more comment than to say: (1) it reveals no conception of the purpose and design of the regulations, and (2) it took three and half months after the Section 6 deadline to send. The Government further seeks refuge in the fact that: (1) no other bank complied with the regulations; (2) Mr. Fitial had no experience in banking; (3) it takes an average one and a half months to process an application; and (4) there were eight local banks that had submitted renewal application. Rather than giving the government refuge or an excuse for its performance (or really lack of same), the Government indicts itself.

[7] The pertinent provisions of 7 CMC § 2204(a) reads: The Government is not liable for the following claims:

(a) Any claim based on an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation ... or based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the Commonwealth agency ... whether or not the discretion is abused.

The Government has pointed out in similar cases involving the Comptroller of The Currency, the Ninth Circuit Court of Appeals has refused to impose liability on the United States because the U.S. Congress did not intend to have a duty run from the Comptroller to the shareholders and directors of national banks.

Harmsen v Smith, 586 F.2d 156 (9th Cir. 1978).

Harmsen and the other cases discussing this point, In Re Franklin National Bank Securities Litigation, 445 F.Supp. 723 and First State Bank of Hudson v United States, 599 F.2d 558 (3rd Cir. 1979) concerned the obligation of the Comptroller to perform examinations of national banks. The purpose of the examinations was held to be to help the Government in its regulation of the banks. The government is concerned with the economic well being of national banks since they insure depositor accounts through the Federal Deposit Insurance Corporation. The purpose of the bank examinations by the FDIC is to prevent losses that would result in claims against insurance funds.

The Receiver points out the obvious. The Commonwealth Bank was not federally insured, the Director of Commerce and Labor/Banking does not stand in the same shoes as the Comptroller of The Currency and the regulations and statutes are not concerned with claims against a government insurance fund.

The threshold question is whether the 1983 regulations and

808

the February, 1984 Banking Code evidenced a clear intent to impose a duty on the Directors to the depositors.

The 1983 regulations were issued for the reason that there was no protection for depositors of local retail banks. In so far as the capitalization requirements are concerned, it is manifest that the purpose was not to assist the government in the regulation of banks but it was to provide a form of protection and insurance to the depositors. That there was a concern for the public, is evident from the general content as well as specific content: "The Director, after ... finding ... that the licensee has ... carried on its business in a manner detrimental to the public interest, or conducted its business in a manner violative of Commonwealth or federal laws; shall ... either ... secure correction, ... or revoke the licensee's retail banking license." Section 16(a)xi, 1983 Regulations (Receiver's Exhibit 1).

Likewise, the 1984 Banking Code evidences clear intent by the legislature to protect depositors, 4 CMC § 6102(a), and obligated the Director of Banking to act in the interest of promoting and maintaining a sound banking system and the security of deposits. 4 CMC § 6108. Section 6106 of Title 4 grants extensive powers to the Director, all designed for the protection of the general welfare of Commonwealth residents.

It is concluded that both the 1983 regulations and the 1984 Banking Code do provide a duty running from the Director to depositors and the United States federal insurance cases are

809

not in point. The case at hand is more akin to <u>Tcherepnin v</u> <u>Franz</u>, 393 F.Supp. 1197 (D.C. Ill 1975) (Tcherepnin I); and <u>Tcherepnin v Franz</u>, 570 F.2d 187 (7th Cir. 1978); cert den. 439 U.S. 876, 99 S.Ct. 219 (Tcherepnin II).

The <u>Tcherepnin</u> cases involved government officials who the court found willfully disregarded their duty to perform certain acts in inspecting and regulating a savings and loan association in Illinois.

The courts held that the government officials owed a duty directly to the depositors and the latter could sue for damages as a result of their losses.

Turning now to the enforcement, or lack of same, by the Director of the 1983 regulations, it is already clear no meaningful interpretation of the government's own regulations occurred, that no effort was made to enforce the 120 day period to provide proof of minimum capitalization and consequently there was no revocation proceedings instituted by way of a hearing, findings and actual revocation. By November 30, 1983, the Government knew without doubt the Commonwealth Bank was operating substantially below the minimum capitalization requirements.

It does not take hindsight to realize on October 6, 1983 the Director should have noticed a hearing and (unless the capitalization of the Commonwealth Bank had met the limits of Section 6(b)) made a finding of violation and proceeded to

revoke the bank's license.[8]

The court concludes the Government failed to exercise due care in the execution of the 1983 retail banking regulations.

One last question must be answered however before liability can be imposed on the government. Were the acts of the Government discretionary or ministerial? If the former, the government still enjoys immunity under the provision of 7 CMC § 2204(a).

In certain cases, it is difficult to determine whether the acts of government officials are discretionary or not. The purpose of the exemption is to permit the government to make planning level decisions without fear of suit. Dalehite v United States, 346 U.S. 15, 32, 73 S.Ct. 956, 966, 97 L.Ed. 1427 (1953); Nevin v United States, 696 F.2d 1229, 1230 (9th Cir. 1983); Lindgren v United States, 665 F.2d 978, 980 (9th Cir. 1982).

In the Ninth Circuit, whether an act or omission falls within the exemption depends generally on whether the act or omission occurred at the planning level or the operational level of government. Nevin v United States, supra.

---

8/
For all practical purposes there was no alternative under Section 16. Although it appears under certain circumstances the Director can take steps to "secure correction of any such insufficiency or non-compliance", meeting the capitalization requirements of Section 6(b) are so basic only revocation of the license is the viable course.

811

The application of these doctrines quickly shows that the Director was at the operational level and not the planning level when the complained of acts or omissions occurred. hen the Director and his staff made the policy decision to regulate and control banks and formulated the regulations evidenced by Receiver's Exhibit 1, all of these decisions and acts were discretionary. However, once the regulations came into effect and it became a matter of implementing and enforcing the regulations, it became strictly a ministerial task. Official duty is ministerial when it is absolute, certain and imperative. All that is to be done is to execute a set task. If the law or regulations prescribes the time, mode and occasion of its performance with reasonable certainty, then there is no room for discretion or independent judgment.

 *The government can only point to Section 16 to support some semblance* of discretion when, after a finding of non-compliance, the Director could take either one of the two steps - secure correction of the deficiency or revoke the license. Seemingly, this provides an "out" for the government but, as seen above, the Director did neither and as a practical matter only one course of action existed. The government's employees, in carrying out their duties specified in the retail banking regulations, simply failed to conform to pre-existing regulatory requirements. <u>Griffin v United States</u>, 500 F.2d 1059, 1069 (3rd Cir. 1974). There is no exemption for the Government in 7 CMC § 2204(a).

812

It is not reasonable, however, to hold the Government responsible to the depositors from the 120th day (October 6, 1983) because even if the regulations had been dutifully enforced some lag time would have occurred in granting the bank a hearing and effecting a revocation. This would not have taken a considerable amount of time but certainly would have been accomplished by November 1, 1983 and the Government will be liable to the depositors from that date, subject to the effect (if any) of the repeal of the regulations by the February 6, 1984 enactment of the Banking Code to which we now turn.

D. DOES THE GOVERNMENT INCUR LIABILITY FOR ITS PERFORMANCE UNDER THE BANKING CODE?

■ It has already been determined that the Code imposed responsibilities on the Director of Banking and with the advent of the Code on February 6, 1984, one could interpret the situation as a fresh start for the Director. This, of course, flies in the face of reason because for several months the Director knew, or should have known, the precarious financial situation of the Bank.

But, even with this background, a resurgence of attention was directed to the Bank when the Director received notice on February 8, 1984 that depositors were unable to withdraw their money from the Bank and a request was made to place the Bank in receivership. (Receiver's Exhibit 9). A meeting was held on February 14, 1984 with the Director, Bank officials, and an

attorney from the Attorney General's Office and as a result certain restrictions were placed on the Bank with the intent and design to protect depositors. (See Receiver's Exhibit 10, dated 2-15-84)

The evidence is uncontradicted that notwithstanding these restrictions, the Bank violated almost every one of them:

1. The Bank was to have an audit performed immediately. Although the Bank apparently contacted an auditor, no audit was done.

2. No shareholders were to withdraw any funds from the Bank. According to the Receiver's accountant, the capital stock was decreased from January 1, 1984 to May 1, 1984 by approximately $30,000 due to offsets on shareholders loans.

3. Whenever there was an excess of $5,000 of withdrawals over deposits in any one day, the Bank was to be closed. The accountant has testified that by comparing the daily records, there were several days when this occurred.

4. The Bank was to provide the Director with a cash flow of total deposits and withdrawals daily. The reports were not rendered daily but in bunches with as many as two to three weeks between submissions.

5. No loans were to be made without notice to the Director of Banking. Numerous loans were made.

With the reports from the Bank given to the Director, he or his staff could have discovered the non-compliance with the Director's own order. Yet the Bank continued to operate to the

loss of its depositors until a lawsuit was filed by a depositor which culminated in the Bank being placed into the receivership at the end of April.

There is no dispute that the Director had the authority to issue his Order of February 15, 1984 pursuant to the provisions of 4 CMC §§ 6106, 6110. Placed in the context of 7 CMC § 2204(a), the decision to place restrictions and limitations on the Commonwealth Bank was a proper discretionary act of the Director. That, of course, is not what the Receiver complains about.

What is evident is that after making the decision to issue the order, there was a complete lack of enforcement. As in the case of the regulations, the operational/ministerial tasks were simply not done.

It is argued that one would have to be an accountant to be able to decipher the reports provided to the Government by the Bank and therefore the Government, through its untrained employees should not be charged with the knowledge of the Bank's default of the provisions of the Order. The answer to such an assertion is quickly put to rest. First, it does not take an accountant to realize the daily reports were not submitted or an audit was not being performed. Second, if an order is issued that requires some basic expertise to determine if there is compliance, it goes without saying that it is incumbent upon the government to provide that expertise. To do otherwise renders the Order a meaningless exercise - which in the case at hand proved to be the fact.

Although it may be argued that the Government should be allowed some reasonable time to enforce the provisions of the Banking Code as was the case of the regulations, the entire record and history of this matter including the alarm bell that was re-rung on February 8, 1984 provides no relief for even a day.

It is concluded that even though a change of law occurred on February 6, 1984, the Government is liable to the depositors for the losses incurred since November 1, 1983 to the date of the closing of the Bank. According to the testimony (Receiver's Exhibit 19) this amounts to $190,415.[9]

The court is not unmindful of the fact that the government is a depositor of the Bank and has suffered at its own hands. Treating the depositors as one and the judgment creditor as another does not comport with justice and an offset will be allowed.

Exactly what the ultimate dollar loss to the government will be is unknown at this time because it will take some time more to determine the extent to which the receivership can collect on outstanding loans which has a direct bearing on the amount of the final loss to each depositor.

---

[9] This figure is arrived at by totalling the operating losses on a monthly basis from November 1, 1983 to April 27, 1984. There were also non-depositor claims of $62,980 approved in the receivership. However, these claims are not included as part of the government's liability as the date of incurring the debt is not known nor whether the debt can be properly included in the scope of the government's liability.

However, until that point is reached the Receiver shall be allowed to deduct from the Government's claim the amount of liability found herein.

## SUMMARY

1. Judgment will be entered in favor of the Receiver against Manuel Sablan, T.B. Cheung, and Albert Camacho for their Section 2.7 liability in the amount of $286,125.

2. Judgment will be entered in favor of the Receiver against Manuel Sablan based on fraud and common law directors liability in the amount of $489,625. This is the maximum extent of Sablan's liability (excluding costs and interest) and is not in addition to his Section 2.7 liability.

3. Judgment will be entered in favor of T.B. Cheung, Albert Camacho, James Cheung, Henry Cheung, Wu Ting Shih, and Greenmount Development Marianas Corporation and against the Receiver on the fraud and common law directors liability counts.

4. Judgment will be entered in favor of the Receiver and against the Government on the Receiver's Fifth Cause of Action, First Amended Cross Claim for $190,415 which shall be exercised as an off-set to the Government's claim on its deposit.

5. Costs shall be allowed the Receiver according to law.

This memorandum opinion shall be the court's findings of fact and conclusions of law pursuant to Rule 52(a), Com.R.Civ.P.

Dated at Saipan, CM, this 13ᵗʰ day of August, 1986.

_____
Robert A. Hefner, Chief Judge